IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| DOROTHY C. CARTER ) | |
| ) | |
| Plaintiff ) | |
| ) | Case No. 17-126 |
| v. ) | |
| ) | |
| OCWEN LOAN SERVICING, LLC ) | |
| ) | JURY TRIAL DEMANDED |
| Defendant. ) | |
| ) | |

## COMPLAINT

Comes now the Plaintiff, Dorothy C. Carter, and files her complaint as follows:

### PRELIMINARY STATEMENT

This action arises from Ocwen's servicing of Plaintiff's home mortgage loan. Specifically, Ocwen failed to properly credit Plaintiff's payoff funds and has failed to comply with federal law by failing to investigate and correct its servicing error and provide certain requested information. Plaintiff seeks damages and attorney's fees for multiple violations of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601 et seq. ("RESPA") and the Fair Debt Collection Practices 15 U.S.C. §§ 1692 et seq. ("TILA"). Plaintiff also seeks damages for breach of the mortgage and note.

### THE PARTIES

1.  Plaintiff is a resident of Baldwin County, Alabama and is over the age of nineteen (19) years.

2.  Defendant Ocwen Loan Servicing, LLC., (hereinafter "Ocwen") is a foreign corporation doing business in Baldwin County, Alabama.

1

**JURISDICTION AND VENUE**

3. This action includes claims which arise under the statutes of the United States and this Court's jurisdiction is conferred by 28 U.S.C. § 1331. Plaintiff also asserts various state law tort claims, with an amount in controversy exceeding $75,000, arising from the same set of operative facts as to which this Court has jurisdiction pursuant to 28 U.S.C. and § 1332 and § 1367.

4. Venue is proper in this District because the wrongdoing complained of occurred in Baldwin County, Alabama, the plaintiff resides in Baldwin County, Ocwen is conducting business in Baldwin County and the subject real property is located in Baldwin County, Alabama.

**FACTUAL ALLEGATIONS**

5. Mrs. Carter owned a home located in Daphne, Alabama.

6. She lived in the home and it was her principal residence.

7. Mrs. Carter obtained a mortgage loan, in the amount of $110,701.00, from GMAC Bank secured by her home June 6, 2009.

8. On April 6, 2011 Carter's mortgage was assigned to GMAC Mortgage, LLC ("GMAC") from Mortgage Electronic Registration Systems.

9. On May 1, 2011 Carter received a load modification from GMAC and the same was recorded in the Baldwin County, Alabama Probate Court on June 20, 2011.

10. On or about November of 2012, Ocwen entered into an asset purchase agreement, that included Carter's loan, with GMAC and Ocwen assumed servicing of Carter's loan shortly thereafter.

11. At the time that Ocwen assumed servicing of Carter's loan it was in default or treated by Ocwen as if it were in default.

12. Carter's Mortgage was assigned to Ocwen on May 23, 2013 and the assignment was recorded in Baldwin County on May 20, 2013.

13. Ocwen uses interstate commerce and the mails to collect debt owed to another.

14. Ocwen "is among the largest servicers of residential mortgages in the United States, and services a portfolio of 6,300,000 residential mortgage loans." See the April 13, 2011 Consent Order between Ocwen and the Officer of the Comptroller of the Currency here:  http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

15. Ocwen is also a "debt collector" as defined by 15 U.S.C. §1692a(6).

16. Ocwen's behavior and conduct herein is part of a pattern of abusive and shoddy practices by which it seeks to make illegal and unearned profits from consumers whose mortgage loans it services.

17. On or about September 10, 2016 the home burned and was considered a total loss by Carter's insurance company, Nationwide Mutual Insurance Company ("Nationwide"). At the time of the fire the home was still subject to the mortgage being serviced by Ocwen.

18. Mrs. Carter contacted Ocwen immediately after the fire and explained that the home was a total lost.


19. Carter informed Ocwen that she wanted to pay the house off with the insurance proceeds. Ocwen responded by sending her a payoff statement on September 29, 2016 and instructing her to endorse the check send it to their payoff department.

20. The seven-page payoff statement contained detailed instructions about Ocwen's payoff procedure, how to calculate the daily payoff and where the payoff funds needed to be sent.

21. As instructed, Mrs. Carter mailed a check from Nationwide in the amount of $122,857.69 on October 24, 2016. This was sufficient to pay her mortgage in full until October 31, 2016, under the terms of the payoff statement.

22. The payoff statement constituted an offer, which was accepted by Mrs. Carter.

23. Carter also called on October 25, 2016 and informed Ocwen that she had sent the check from Nationwide.

24. A few weeks later, Nationwide contacted Mrs. Carter and informed her that the payoff check had not cleared the bank. Carter immediately called Ocwen and was told that the check would be processed within three days.

25. Ocwen finally deposited the check but failed and refused to apply it to Carter's loan. Instead, Ocwen instituted foreclosure proceedings and charged additional interest and fees.

26. Carter's mortgage states in pertinent in part the following:

> **3. Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows
> **First,** to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium,

      **Second,** to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required,
      **Third,** to interest due under the Note,
      **Fourth,** to amortization of the principal of the Note, and,
      **Fifth,** to late charges due under the Note.

27. Ocwen breached the parties' agreement by not applying the proceeds to the loan pursuant the instructions it had given Mrs. Carter and the terms of her mortgage.

28. Mrs. Carter, at various times, notified Ocwen that her account was in error. She notified Ocwen in writing on December 13, 2016. This written notice included a statement of the reasons that the account was in error and provided sufficient detail to Ocwen regarding other information sought by Mrs. Carter.

29. Mrs. Carters written notice constituted a Qualified Written Request ("QWR") as defined by 12 U.S.C. § 2605(e)(1)(B).

30. On January 5, 2017 Ocwen acknowledged receipt of the QWR.

31. On January 10, 2017, Mrs. Carter received a response to the QWR stating that her payoff funds had been applied to "Hazard payment."

32. Instead of applying the insurance funds to her loan as instructed by Mrs. Carter in writing, and pursuant to the payoff statement, Ocwen replied using a standardized form based letter which contains boilerplate instructions not tailored to her individual requests. Instead of correcting the problem Mrs. Carter complained about in the QWR the letter gave new payoff instructions that contradicted the earlier, September 29, 2016, instructions.

33. Ocwen took no reasonable measures to correct the error identified in Mrs. Carter's letter and simply passed the buck by instructing Carter to call another Ocwen department.

34.     Ten days later, on or about January 20, 2017, Ocwen sent Mrs. Carter a document entitled "Mortgagor's – Payoff Affidavit." The document instructed her as follows:

> Please find attached the affidavit valid through 03/01/2017.
>
> The executed affidavit must be returned no later than 02/22/2017 in order to process your payoff without additional fees.
>
> If funds must be returned with the affidavit, the executed affidavit and the required funds must be received no later than 02/22/2017 in order to process your payoff without additional fees.
>
> All funds exceeding $500.00 must be a Certified check, Bank check, or money order. Please do not wire the payoff funds. Since you are using are insurance claim funds as all or part of the payoff, we must deposit the funds into your hazard suspense account and transfer one total payoff amount.

35.     The payoff affidavit contradicted the earlier payoff instructions and the payoff figure had ballooned to $124,503.07.

36.     In the meantime, Ocwen continued to publish foreclosure notices in a local newspaper with advertising a sale date of January 20, 2017.

37.     Under the terms of the Mortgage, had Ocwen foreclosed, it would have been entitled to both the property and the insurance proceeds.

<div style="text-align:center">

**COUNT I**
**BREACH OF CONTRACT**

</div>

38.     The plaintiff realleges all prior paragraphs as if set out here in full.

39.     Ocwen, by failing to apply the proceeds after Mrs. Carter followed its instructions was a breach of the mortgage and payoff statement.

40.     Ocwen has breached the terms of the mortgage agreement by applying account charges that are not reasonable, not necessary, illegal, unauthorized, wrong in nature or amount and or otherwise manufactured for the purposes of creating a default.

41. Ocwen has breached the mortgage by accepting the payoff of the mortgage but failing and refusing to apply the payoff funds in breach of the payment covenant in the mortgage and the applicable industry and regulatory standards.

42. As a proximate result of this breach, the defendant is liable to the plaintiff for all natural, proximate and consequential damages that are a result of this breach.

WHEREFORE, premises considered, the plaintiff demands judgment against the defendant in such an amount of compensatory damages as a jury deems reasonable and may award after a trial on the merits of this action.

## COUNT II
## CONVERSION

43. The plaintiff adopts and realleges all prior paragraphs as if set out here in full.

44. The insurance proceeds from the loss of Plaintiff's home to fire were paid pursuant to the Plaintiff's property insurance policy and belonged to and were the property of the Plaintiff until such funds were used to pay the sums secured by the Mortgage on the Plaintiff's Property.

45. Ocwen received funds belonging to Plaintiff, and instead of applying them to Plaintiff's mortgage, converted them to its own use.

46. This constituted a wrongful taking, an illegal use or misuse and/or an illegal assertion of ownership of the Plaintiff's property.

47. This illegal conversion was done wantonly, recklessly, willfully and/or under circumstances of insult, malice and/or in knowing violation of the Plaintiff's rights.

48. As a result of the above actions, the Plaintiff has been, and continues to be, injured and damaged.

WHEREFORE, premises considered, the plaintiff demands judgment against the defendant in such an amount of compensatory and punitive damages as a jury deems proper and may award.

## COUNT III
## RESPA

49. The Plaintiff adopts and realleges all prior paragraphs as if set out here in full.

50. The plaintiff adopts and realleges all prior paragraphs as if set out here in full.

51. One or more of the written communications between Plaintiff and Defendant constituted a Qualified Written Request ("QWR") as that term is used in 12 U.S.C. § 2605(e)(1)(b).

52. The mortgage loan at issue was "federally related" as that term is used by 12 U.S.C. § 2605(a).

53. After receipt of the QWR, Ocwen failed to "make appropriate corrections in the account of" Mrs. Carter in violation of 12 U.S.C. § 2605(e)(2)(A) and (B).

54. Despite notice and knowledge that Plaintiff was disputing Ocwen's treatment of her account Ocwen reported derogatory information to credit bureaus in violation of 12 U.S.C. § 2605(e)(3).

Wherefore, Plaintiff demands judgment for actual damages, statutory damages and attorney's fees.

## COUNT V
## FAIR DEBT COLLECTION PRACTICES ACT
## ("FDCPA")

55.     The plaintiff adopts and realleges all prior paragraphs of the complaint as if set out here in full.

56.     The debt at issue herein is a consumer debt because it was secured by a mortgage on the plaintiff's principal residence.

57.     Ocwen is a debt collector because it received an assignment of the debt at issue after the debt was considered it to be in default.

58.      Ocwen has violated the FDCPA in at least the following ways by:

59.     Engaging in conduct designed to harass, oppress, or abuse the plaintiff in connection with the collection of a debt;

60.     Charging fees and interest that it was not legally entitled to;

61.     Threatening to take nonjudicial action to effect dispossession the plaintiff's property when it had no legal right to do so.

Wherefore, Plaintiff demands judgment for actual damages, statutory damages and attorney's fees.

/s/ Earl P. Underwood, Jr.
Earl P. Underwood, Jr.
Underwood & Riemer, PC
Attorneys for Plaintiff
21 South Section Street
Fairhope, AL 36532
(251) 990-5558 Telephone
(251) 990-0626 Fax
epunderwood@alalaw.com
kjr@alaconsumer.com

9

## **DEMAND FOR JURY TRIAL**

The Plaintiff hereby demands a trial by struck jury on all claims so triable before the Court.

/s/ Earl P. Underwood, Jr.